AO 106 (Rev. 12/03)  Affidavit for Search Warrant  8/07

**SEALED**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Search of<br>(Name, address or brief description of person, property or premises to be searched) | **APPLICATION AND AFFIDAVIT**<br>**FOR SEARCH WARRANT** |

355 E. Lassen Ave., Apt. 53
Chico, CA 95973

Case Number:

**2:10 - SW - 0184  GGH**

**FILED**

APR 21 2010

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

I, SA John Piotrowski being duly sworn depose and say:

I am a(n) <u>Special Agent of the U.S. Secret Service</u> and have reason to believe that ☐ on the person of or ☐ on the property or premises know as (name, description and/or location)

**See Attachment A-2**

in the _____ **EASTERN** _____ District of _____ **CALIFORNIA** _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

**See Attachment B**

which is (state one or more bases for search set forth under Rule 41(c) of the Federal Rules of Criminal Procedure)

**fruits, evidence, and instrumentalities of crime**

concerning a violation of Title **18** United States code, Section (s) **1341, 1343, 1344, 1956, 1957**
The facts to support a finding of probable cause are as follows: **See Attached**
Continued on the attached sheet and made a part hereof:   ☒ Yes   ☐ No

_____
Signature of Affiant
SA John Piotrowski

Sworn to before me and subscribed in my presence,
_April 20, 2010_____   at   _Sacramento, CA_____
Date                                                                City                      State

<u>HON. GREGORY G. HOLLOWS</u>                    **GREGORY G. HOLLOWS**
Name of Judge                    Title of Judge                    Signature of Judge

UNITED STATES DISTRICT COURT )
)
EASTERN DISTRICT OF CALIFORNIA )

APPLICATION AND AFFIDAVIT OF JOHN PIOTROWSKI FOR SEARCH WARRANT

I. INTRODUCTION

1.      I make this affidavit in support of an application by the United States of America for the issuance of a warrant to enter and search the following building and premises more fully described in Attachments A-1, A-2, A-3 and A-4, incorporated herein by reference:

Attachment A-1:  8720 Seville Circle, Granite Bay, CA 95746

Attachment A-2:  355 E. Lassen Ave, Apt 53, Chico, CA 95973

Attachment A-3:  12650 Madrone Lane, Truckee, CA 96161

Attachment A-4:  Vehicles registered to Kathleen Newcomb and described below

        These properties are hereinafter collectively referred to as "The Subject Premises."

2.      The items to be searched for and seized are more specifically described in Attachment B.

3.       Information that I have collected in the course of this investigation establishes probable cause to believe that evidence of violations of Title 18, United States Code, Sections 1341 (Mail Fraud), 1343 (Wire Fraud), 1344 (Bank Fraud) 1956 (Money Laundering), 1957 (monetary transactions in criminally derived property) will be found at the Subject Premises.

4.      The facts set forth in this affidavit are based on my own personal knowledge and also information received from Placer County Sheriff Detective James Hudson and knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers and fraud investigators; my review of documents related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience.  I believe the facts herein are adequate to establish probable cause that evidence, fruits, contraband, and/or instrumentalities of crime will be found at the Subject Premises.

## II. EXPERIENCE AND TRAINING

5.     I am a Special Agent with the United States Secret Service (hereinafter referred to as USSS) and have been so employed since April of 2007. I am currently assigned to the Sacramento Resident Office. As part of my duties, I investigate offenses involving fraud, including financial crimes, identity theft, counterfeiting, and computers. I have received extensive training at the Federal Law Enforcement Training Center, Glynco, GA and at the U.S. Secret Service Training Academy, James J. Rowley Training Center, Beltsville, MD. I am authorized to investigate violations of federal law and to execute warrants issued under the authority of the United States.

6.     As a Special Agent with the USSS, I have experience and have participated in numerous criminal investigations relating to computer fraud, identity theft, access device fraud, counterfeit identification, bank fraud, wire fraud, and conspiracy. I have had training concerning the workings of the finance industry. I have also been briefed by and had conversations with other Special Agents within the USSS about other investment fraud investigations, both locally and nationally.

7.     Based on my experience both as a law enforcement officer and a lay person, I believe that persons involved in financial fraud are likely to use computers, printers, computer software, and data storage devices. I believe that this is true because these tools are ubiquitous in our society generally, and are commonly used for communications and financial transactions, both legitimate and fraudulent. I believe that the subject used at least one computer in this particular case, because victims have shown me emails and text messages that they say were, and appear to have been, sent by Royce Newcomb.

8.     I am currently conducting an investigation of what appears to be an investment fraud. In this Affidavit, I use the term "Investment Fraud" to mean a fraud whereby a fraudster obtains money by telling investors that their money will be used for an investment, but, when they give him the money, he actually uses the money in other ways, such as paying for personal expenses and returns to earlier investors.

## III. FACTS SUPPORTING PROBABLE CAUSE

Introduction

9.     I am investigating what appears to be an investment fraud perpetrated by Royce Newcomb, Barry Winnett, and possibly others. Initially, three persons were identified who gave Newcomb money for investment and, subsequent investigation has uncovered, their money was not used for investment. These three were invited to invest money in real estate transactions. But the transactions never closed and the investors never received their money back. At times, Newcomb would attempt to talk them into "rolling over" their supposed earnings into a new investment that promised an even larger payout. Review of bank records indicates that in reality, Newcomb used the incoming funds to

pay personal expenses and pay persons whom I have identified as earlier investors. The first three victims identified gave Newcomb $1.7 million and got back nothing.

10.     On 2/19/10, Detective James Hudson and I met with Kevin Woody and John Angerer at the Placer County Sheriff's Office in Auburn, California. Woody and Angerer requested a meeting regarding an investment scheme in which they said they were victims. They stated the following in summary:

11.     Woody stated that he has known Royce Newcomb for several years. During this time, Woody has been aware that Newcomb was active in real estate investing and appeared to be very successful. According to Woody, Newcomb was always driving nice cars and lived in a house in the affluent neighborhood of Los Lagos in Granite Bay, California. Approximately one year ago, Newcomb approached Woody and pitched an offer for Woody and Angerer to invest in a property that was available. This included a house for sale in the Newcastle, California. Both victims placed cash in the investment. Unbeknownst to Woody and Angerer, the house was a piece of property that was used to cultivate marijuana. According to Woody, after they purchased the house from the owner, they were notified that the federal government had placed a seizure order on the house. They are now in involved in legal proceedings with the former owner, who is incarcerated, to attempt to retrieve their investment money.

12.     Newcomb continued to pitch investment ideas to Woody and Angerer. Woody later invested $500,000 for notes on foreclosed properties that Newcomb presented to him. Newcomb supposedly sold the notes and/or properties and made enough profit to give Woody his initial investment plus $85,000. However, Woody was never actually paid the money. Newcomb then told Woody and Angerer he was involved in a deal to purchase 18 houses in the Citrus Heights area. This deal was for $1.7 million. This price was too expensive for Angerer but Woody put Newcomb in contact with his brother-in-law, Thomas White. Newcomb told Woody deal appeared to be profitable because most of the houses were already being rented. Newcomb presented them a plan that after they took possession of the houses, they would do low-cost rehab to the residences and flip them for a profit. Newcomb showed the victims rental agreements for the houses that showed they were rented and he showed them comps for the area which made it appear that they were buying the houses for less than the market value.

13.     Once they were convinced their investment was not at risk, Woody and White decided to invest in the deal. Newcomb told Woody and White he needed some money immediately to show the sellers he was serious about the deal. Woody began by making wire transfers to an escrow company that Newcomb had told them was involved in the deal. The money was to be held by this escrow company. The escrow company was called Contour Escrow Services, Inc. At the height of the deal, White had invested $875,000 and Woody invested around $700,000. $85,000 of that was already in the escrow account that was supposed to be profit from a former deal with Newcomb. Though Woody was only told the money was in escrow, he had never known for sure.

3

Woody and White were under the impression that this money was in the escrow account and was to be used to close on the 18 houses.

14.     Newcomb supplied Woody and White with updates on the status of the deal and told them of the ongoing negotiations. While this deal was being processed, Newcomb told them of another deal he was working that included a house that he was willing to let them invest in. The deal was for four properties that included a dental building. It was part of a family trust that Newcomb was purchasing. He told them he already had a buyer for the medical building but was willing to let them buy a house on 1106 Doe Court, Roseville, California that was part of the four-property deal. Woody and Angerer decided that they would buy the house on Doe Court that was being sold as part of the deal for $205,000. They each placed $102,500 into what was represented to be an escrow account with "Contour Escrow Services." Subsequent investigation revealed that Contour Escrow Services is controlled by Barry Winnett and is not an escrow service at .all. (See below.)

15.     After these funds were invested, the victims felt they had security with their investments as the funds were held in escrow and were told that there money was not at risk. As weeks went by, they began to ask Newcomb about the status of the negotiations. Newcomb would always respond with news that he was negotiating the deal and that the buyers were asking for a higher price and he was working to make the deal go through. There always seemed to be an excuse. The victims felt that once the money was in the escrow account, the deal should have gone through to closing shortly after the money was deposited.

16.     Woody and Angerer came to believe that Newcomb stole their money. They asked for an accounting of their funds and demanded to know where their funds are located. Winnett forwarded them a copy of a wire transfer that showed that Winnett wired $1,500,000 from his account to a Bank of America account and that money was placed in an escrow account. Det. Hudson and I reviewed a document provided by Woody and Angerer showing the wire transfer. It was purported to have been made on 1/26/10. It showed funds totaling $1,500,000 were sent from a Contour Escrow Services account at First Bank to a Chicago Title Company account at Bank of America. The account number for Chicago Title Company was not listed on the wire transfer. Hudson also noticed that the money was transferred to Bank of America in Brea, California. Hudson was aware from prior cases that Bank of America only accepts wire transfers to their branch in Concord, California when wire transfers are made to California. According to Jeannette Lowe, Bank Investigator for Bank of America, the funds were never received by the bank because the Brea, CA location does not receive wire transfers. Also, according to First Bank, the Contour Escrow Services, Inc. account never contained $1.5 million.

17.     On 2/22/10, a state search warrant was served on the office of Contour Escrow Services, Inc located at 1340 Blue Oaks Blvd, Ste 100, Roseville, California and Barry Winnett's home located at 514 Bridgeford, Roseville, CA.

4

18.     Winnett made statements during the search of his home. He stated he only has $16,000 in his accounts for Contour Escrow Services. Winnett stated that Newcomb tells him where to send any money he receives. Winnett stated that the money he gets on behalf of Newcomb is usually used to pay premiums to former investors. Winnett admitted he does not have any license except his salesman license for real estate. According to the California Department of Corporations, any person operating an escrow company must apply for a license through the Department of Corporations. A background check is conducted to determine whether or not the license is granted. An escrow agent operating without a Department of Corporations issued license is operating illegally. On that point, the United States Attorney's Office has directed me to Section 17200, et seq. of the California Financial Code. A check with the California Department of Corporations showed that Contour Escrow Services, Inc. does not have a license on file. Winnett stated his broker of record was not in any way associated with Contour Escrow Services. Winnett admitted to fabricating the $1.5 million money transfer to show the victims' money was transferred to another escrow account. The doctored document was found in Winnett's garage.

19.     Winnett maintains records that show where the money goes and, during the search, was permitted to log onto his computer to display and print those records to show law enforcement. Winnett showed the following records that appear to be from two bank accounts for Contour Escrow Services.

20.     The documents provided by Winnett start in 9/2009 and carry through to 02-22-10. They start after Woody deposited over $200,000 of his money.

First Bank - Account xxxxxx-6488

| | |
|---|---|
| Balance on 09-02-09 | $102,186 |
| Balance on 02-19-10 | $17,598.82 |
| Deposits to account from 09-02-09 through 02-22-10 | $2,156,026 |
| From 09-02-09 through 02-22-10 funds released to Royce Newcomb: | $171,350 |
| Funds released to Barry Winnett for same time frame | $61,900 |
| From 09-02-09 through 02-22-10 funds released to RK Investments: | $105,276 |
| Deposits to account in the name of RK Investments: | $114,500 |

21.     On 9/21/09, $250,000 of Woody's funds were deposited into First Bank - Account xxxxxx-6488. Prior to the deposit, this account had a balance of $593.75. Once Woody's money was deposited, the following funds were released on the same day:

| | | |
|---|---|---|
| 09-21-09 | Barry Winnett | $500.00 |
| 09-21-09 | Royce Newcomb | $10,000 |
| 09-22-09 | Barry Winnett | $2,200 |
| 09-23-09 | Win Financial Corp | $130,000 |
| 09-23-09 | Ray Schiavone | $27,000 |
| 09-23-09 | George Sugarman | $10,000 |
| 09-23-09 | Geoff Bagetelos | $52,000 |

5

| 09-23-09 | RK Investments | $8,276 |
| 09-23-09 | Kiana Investment | $10,000 |

The balance in the account after these transactions occurred was $617.75.

22.     On 11/13/09, Woody provided a cashier's check for $102,500 that was deposited into First Bank – Account xxxxxx-6488. The account balance prior to the deposit was $29,256.88. The following withdrawals occurred on the same day:

| 11-13-09 | First Bank | $65,000 |
| 11-13-09 | Geoff Bagetelo | $10,000 |
| 11-13-09 | Royce Newcomb | $13,000 |
| 11-13-09 | Royce Newcomb | $5,000 |
| 11-13-09 | Barry Winnett | $600 |
| 11-13-09 | Jesse Bradman | $15,000 |

These transactions reduced the balance on the account to $23,156.

23.     On 11/13/09, John Angerer wired a deposit of $102,500 into Contour Escrow Services' Union Bank account – xxxxxx-5119. This deposit was for John Angerer's half of the purchase price of the property on Doe Court. The balance of this account prior to the deposit was $16,800. Once the deposit was made to the escrow account, the following withdraws were paid out.

| 11-13-09 | H&B Investments | $4,097.50 |
| 11-13-09 | Grand Opportunities | $4,097.50 |
| 11-16-09 | two deposits into account for a total of | $39,000 |
| 11-16-09 | Baba Ali's Corp | $10,000 |
| 11-16-09 | Steve and Robin | $25,000 |
| 11-16-09 | George Sugarman | $30,000 |
| 11-16-09 | Barry Winnett | $2,500 |
| 11-17-09 | Chicago Title | $50,000 |
| 11-19-09 | Barry Winnett | $4,500 |

The balance on this account as of 11/19/09 was $28,062.50.

24.     On 12/18/09, White (Woody's brother-in-law) deposited his funds of $875,000 into Contour Escrow Services' Union Bank account – xxxxxx-5119 - for his share of the purchase of the 18 houses in Citrus Heights. Prior to his funds being deposited, the balance on the account held in this account was $13,783.52. Once White's funds were deposited, the following transactions occurred on this account on the same day.

| 12-18-09 | George Sugarman | $360,000 |
| 12-18-09 | Steve and Robin | $140,000 |
| 12-18-09 | Accurate Investments | $140,000 |
| 12-18-09 | Geoff Bagatelos | $68,000 |

| 12-18-09 | David Roberts | $45,000 |
| 12-18-09 | RK Investments | $10,000 |
| 12-18-09 | Frank Almos | $10,000 |
| 12-18-09 | Almos Construction | $10,000 |
| 12-18-09 | Junanita Rodriguez | $10,000 |
| 12-18-09 | Richard Torres | $3,000 |
| 12-18-09 | RK Investments | $10,000 |
| 12-18-09 | RK Investments/Larry Blain | $13,000 |

After these payments were made, the account had a balance of $69,388.02.

I have reviewed bank account statements for these accounts. Each of the transactions from Winnett's spreadsheets appears on the bank account statements. However, Winnett's spreadsheets are incomplete in that there are transactions on the bank statements that do not appear on Winnett's spreadsheets. I have not yet been able to figure out the significance of these omissions.

25.     Winnett admitted knowing that what he was doing was illegal, but he did it at the request of Newcomb to pay the bills. Winnett stated he understands how escrow funds are supposed to be kept and is aware he has a responsibility to be the middle man and secure funds so that they are safe. He admitted he used the funds entrusted to him at the request of Newcomb to pay the premiums owed to other investors.

26.     Detective Hudson looked through additional documents and found escrow receipts and e-mails where people were asking for Winnett to create fake escrow documents to show proof of funds held in escrow so that they could buy "tapes". Hudson reviewed these documents and observed that Winnett had created fake escrow receipts for them and faxed them to companies inquiring if the subjects had the funds held in escrow. These documents purported to show that the subjects had in some cases $10,000,000 in funds and up to $25,000,000 in escrow accounts held by Contour Escrow Services. Winnett stated the subjects paid him $1,000 for the fake documents. He told me that he had no problem doing them as the "tapes" they were going to buy would never occur and he did it for the money.

27.     During the search of Winnett's home, Newcomb called several times. The first time he called, Winnett let the call go to voicemail. After a brief discussion, Winnett was instructed to answer the phone the next time Newcomb called and deny knowing that the police had warrants to search his office and home. Winnett did as instructed and the call ended. Newcomb called again and Hudson told Winnett to tell him the police had served a search warrant to his business. Hudson listened as Newcomb was very concerned. Newcomb stated that the police are going to figure everything out and that they were in trouble. He stated that if he could just close a deal he would be able to pay the money back and this would all go away because it was all about the money. Newcomb asked if the police had shown up at Winnett's house. Winnett told him no. Newcomb said he would call him back. It was during these calls that we learned Newcomb's phone number was 916-289-1789. Newcomb called again and Winnett was instructed to tell Newcomb

7

the police were now searching his house and now have everything. When the call ended, Hudson called Newcomb at 916-289-1789. Hudson introduced himself and told Newcomb why a search was being conducted on Winnett's home/business. Newcomb stated he had no idea what Hudson was talking about. Hudson advised Newcomb that police were aware that Newcomb was paying former investors with newly recruited funds and the pyramid scheme was collapsing. Newcomb told Hudson he was going to pay everyone back if he could close a deal he was working on. Newcomb refused to elaborate on the deal. Newcomb could not answer the question of how many victims are going to come forward. The call concluded when Newcomb stated he had to go and call his attorney.

28.     Documents indicate that Royce Newcomb is connected to 148 transactions at California Check Cashing Stores, LLC in the Sacramento area between 1/18/2000 and 1/29/10. The total of these transactions is $4,099,163. A majority of the proceeds from these transactions were given to Newcomb in cash, while many transactions involve money being spread evenly over 4 different NetSpend pre-paid debit cards. Research on the NetSpend account numbers showed the issuing bank for those cards was Inter National Bank headquartered in McAllen, Texas. The amounts on the pre-paid debit cards were normally around $900. Pre-paid debit cards or "stored value cards" physically resemble traditional credit and debit cards, but do not require the individual to have a bank account. The individual can add money to the cards in a variety of ways such as using a credit card online or negotiating a check at a check cashing store and having the store place all or part of the check amount on the cards.

29.     It seems suspicious to me that a person or entity with a bank account would use a check cashing store to negotiate so many checks for so much money. The fees that California Check Cashing Stores, LLC charges patrons are far greater than banks charge to negotiate checks:
   - A flat fee for amounts up to $1,400
   - 2.5% for amounts $1,400 and above
   - 4.5% for money orders
   - 4.5% for two party checks
   - 6% for one party checks

30.     Investigation of emails provided by Kevin Woody, John Angerer and Thomas White are evidence that Kathleen "Kathy" Newcomb is also involved in the operation. Kathleen Newcomb is a licensed real estate agent and the owner of the homes located at 8720 Seville Circle, Granite Bay, California and 355 E. Lassen Ave, Apt 53, Chico, California. Her name and social security number were run in the California Department of Motor Vehicles Database and I found that Kathleen Newcomb is also the registered owner of the white Mercedes GL450 SUV, Black Mercedes CL600, silver Volkswagon Jetta, black Lincoln Navigator and four snowmobiles described below. The Vehicle Identification Numbers and license plate numbers of the above vehicles are listed in Attachment A-4. It is believed that she is currently living at the Chico, California address because Woody recently went there to speak to her.

8

31.    Newcomb wrote in an email to Kevin Woody on 10/9/09 that "Kathy will complete all the sales transactions for the following rates: a. Inside sale with no other agent involved and represent both sides - 3%; b. Outside sale with another agent involved - 2% to Kathy / 2.5% to other agent." Newcomb wrote in an email to Thomas White on 12/15/09, "My wife Kathy is a licensed real estate agent and represents us on any deal where we buy or sale on the open market."

32.    When Barry Winnett was first interviewed by Detective Hudson and me during the execution of a search warrant at his residence, Winnett stated that RK Investment Properties, LLC was Royce Newcomb's business and that the "RK" stood for "Royce and Kathy". I researched RK Investment Properties, LLC on the Internet and found through the California Secretary of State website that the LLC was established on 12/4/2006 and is currently "Active". We expect to serve subpoenas on the document custodians of RK Investment Properties, LLC for information similar to what is listed in Attachment B. Kathy may also be served with a subpoena for some of the records she is required to maintain as a real estate agent. The address to RK Investment Properties, LLC is listed as 1000 Sunrise Ave, Suite 9B, #124, Roseville, CA 95661. I went to the location and found that the business located there is named "It's In The Mail" and provides Post Office Boxes, mailing and shipping supplies. I have reviewed the application information for box #124. The name on the application is Royce Newcomb. Kathleen Newcomb also has a mailbox there. The manager contacted me via fax on 3/9/10 and stated Royce Newcomb picked up his mail and he was driving a white Mercedes SUV with no front license plates. She also stated that the Newcombs come to pick up their mail sporadically. On 3/31/10, I attempted to view the website "http://www.rkinvestmentproperties.com" and found that the site is "Temporarily Unavailable."

33.    On 3/30/10, I contacted 5 people who said that they had invested money with Newcomb. I asked then about their experiences with Royce Newcomb. The following paragraphs describe their recollections:

        a.    George Sugarman told me he met Newcomb approximately 3 years ago through a mortgage broker from southern California. Newcomb was negotiating real estate deals where he would buy properties, rehab them and sell the properties again for profit. Sugarman understood that deals like this require "hard money" up front and agreed to invest. Sugarman never agreed to a set percentage of the profit. He claimed that he would invest a couple hundred thousand dollars and after the rehab and resale, Newcomb would offer him a cut of the profit. Sugarman invested with Newcomb 10-15 times between 2007 and 2010. Sometimes the deals went through as Newcomb advertised, other times they did not. A few times, the deals did not work and Sugarman analyzed the deal and just bought the properties himself. Currently, Sugarman is owed between $600,000 and $700,000. Right now he is "stuck" with 3 houses that he invested in but that Newcomb could not sell.

        In February 2010, Sugarman received a phone call from Det. Hudson. After the call, Sugarman called his mortgage broker and asked him to check the titles of the three

properties Newcomb cannot sell. Sugarman was told that one home is clear. One house, located at 2117 3rd Street, Sacramento, CA on which Sugarman has a Grant Deed and a Deed of Trust, has two other mortgages on it. He states that he had no prior knowledge of the other mortgages. Sugarman then learned that the third home, located at 3741 34th Street, Sacramento, CA, on which he has a Deed of Trust, was never recorded and never actually purchased. Sugarman considers Newcomb to being a "bad businessman" but doubts he intentionally started a Ponzi scheme.

Sugarman has been to Newcomb's home located at 8720 Seville Circle, Granite Bay, CA three times. He admitted to talking business in the residence and that Newcomb works from an office in the home. Sugarman was not aware of Newcomb working from an "office" outside his home. He stated he visited Newcomb's rental property located in Truckee, California, twice, although he could not confirm the address. Sugarman stated that business was discussed at the residence and that Newcomb took Sugarman and his wife out on snowmobiles located at the property. Sugarman confirmed that there were 4 snowmobiles at the property. Sugarman further said that he and Newcomb never shielded any business discussions from Kathleen Newcomb. Sugarman said that he had a feeling that Kathleen Newcomb was collecting the commissions for both the "buyer and seller" of the investment properties. During their business relationship, Sugarman observed Newcomb driving a black Mercedes C600 coupe, a black Lincoln Navigator and a white Mercedes SUV. Newcomb and Sugarman last spoke on/around 3/16/10. Sugarman stated he asked where his money currently is located and said that Newcomb avoided the question.

In an email provided by Sugarman that he received from Newcomb on 1/21/10, multiple flyers for investment properties were attached. The title of the email was "New Opportunities" and contained property in Waipahu, Hawaii among other properties in and around the San Francisco Bay area.

      b.    Quentin Holloman told me that he visited the house located at 8720 Seville Circle, Granite Bay, California in the fall of 2009. He stated that Kathleen Newcomb was not present during any business talks with Royce. Holloman believes Newcomb is working out of his home because he never discussed any or met Newcomb in any sort of separate "office". Their meetings consisted of meeting at properties they were supposedly investing in, Holloman's office, or at locations around Sacramento, California. While visiting properties or having business meetings, Holloman observed Newcomb driving a black Bentley, a Mercedes SUV, or a Mercedes coupe.

      c.    Thomas White told me that he met Royce Newcomb face-to-face one time in Citrus Heights, California during the week of 12/14/09. After they viewed properties that White was supposedly investing in, Newcomb drove White to Newcomb's home located at 8720 Seville Circle, Granite Bay, California (Attachment A-1). They entered the home and Newcomb briefly introduced White to Kathleen Newcomb and stated that she is a real estate agent and would be marketing the investment properties after their rehabilitation. White assumes Newcomb works from home and has never heard about

Newcomb having an "office." During their visits to the investment properties, Newcomb was driving a white Mercedes SUV.

d.      John Angerer told me that he met with Royce Newcomb on two occasions. One time was at a potential investment property and the second time was at a birthday party at Kevin Woody's home. Angerer met Kathleen Newcomb at Kevin Woody's home, but never discussed any business with her. Angerer said that to the best of his knowledge, Newcomb worked out of his home, but Angerer did not have any specific information in this regard. He has no recollection of what type of vehicle Newcomb was driving during that time period.

e.      Ali Faison told me that he met with Royce Newcomb multiple times around the Sacramento area with Quentin Holloman. The meetings were either at potential investment properties, in locations around Sacramento or in Holloman's office, but never in an office that Newcomb owned/controlled. He has never been to Newcomb's home located at 8720 Seville Circle, Granite Bay, California and has never met Kathleen Newcomb. During their business meetings, Faison observed Newcomb driving a black Bentley, a Mercedes SUV and a Mercedes sedan.

f.      Kevin Woody - met with Newcomb frequently throughout the second half of 2009. He visited Newcomb's home located at 8720 Seville Circle, Granite Bay, California where, in the garage, Woody observed a black SUV (Suburban or Expedition) and a Mercedes C-class vehicle. Woody also observed Newcomb driving a black Bentley and a white Mercedes SUV. In addition to the home in Granite Bay, California, Woody spent a weekend with Royce and Kathleen Newcomb at their rental home located at 12650 Madrone Lane, Truckee, California. There, Woody observed 4 snowmobiles and a snowmobile trailer. Woody also claims to have spoken with Kathleen Newcomb through the door of her home located at 355 E. Lassen Ave, Apt 53, Chico, California on the weekend of 3/20/10. Woody has been distraught and agitated over the events described herein. At various times, he has indicated that he has had fantasies about using violence against Newcomb to find out where Woody's money is and he has also told a government agency that if the government does not stop Newcomb, Woody will "take out" Newcomb. I do not regard these statements as affecting Woody's credibility about the underlying events. Woody has heard that investigators are working on this matter and he has apologized and emphatically agreed to refrain from contacting Newcomb in any way unless under investigators' supervision (such as a monitored phone call.)

33A.    Faison told me that Royce has recently told him that Royce would get Faison's money back if he can just close a deal. Separately, Woody told me that Royce has recently told him that Royce would get Woody's money back if he can just close a deal. I take Royce's statements to Woody and Faison to mean that Royce is either lying and does not intend to repay them, has some legitimate investment that I do not know about, or, if Royce is acting consistently with the Ponzi-scheme behavior observed in the Contour Escrow Services account, is attempting in Ponzi scheme fashion to recruit new investors so that he can pay off the demands of earlier investors. This is why I am seeking

authority to search for contracts and solicitations for investors not identified in this
Affidavit.

34.     Emails and text messages between Royce Newcomb and investors were collected
during the course of this investigation.  Newcomb used the email account
getpumped01@comcast.net. Further analysis of the emails show confirmed that
Newcomb was contacting investors via a telephone with the number 916-289-1789.  In
the beginning of the email strings, the general theme is that Newcomb has great
investment opportunities that will all but guarantee a good return on investment.
Newcomb then attempts to line up when the investors can gather the needed funds to
make the deal go through.  Once the investors get their investment capital to Newcomb
and the deal does not close, the emails general theme turns to Newcomb asking for more
time and patience to make the deal work.  Or, Newcomb describes even better
opportunities.  Of all the emails read to date, I have not seen Newcomb tell anyone where
their money is invested.  When the investors ask for the money they put in escrow to be
returned, Newcomb uses various excuses to ask for more time.

34A.   I have reviewed the June 30, 2009 bank statement for Contour Escrow Services,
Inc.'s account at First Bank.  It contains numerous transactions.  I believe that records
going back to June of 2009 will be evidence of the fraud described herein because in June
2009 there are transactions with people I have identified as victims.  The statement shows
that Contour on June 25, 2009 received $100,000 from George Sugarman, and made a
$108,000 payment to Jesse Bradman Music.  Sugarman is described above.  I have been
in telephonic contact with Jesse Bradman, who said that he was an investor who has lost
about $95,000.  Evidence of how these relationships with investors began will be relevant
and evidentiary in any fraud case that arises out of the facts described herein.

IV.  ADDITIONAL KNOWLEDGE ABOUT ITEMS LIKELY TO BE FOUND

35.     Based upon my training and conversations with other agents, which is discussed
in the first section of this affidavit, and through consultation with other USSS and federal
agents who are experienced in financial fraud investigations, I have learned the following
additional information that is relevant to this application for search warrant:

        a.  Individuals involved in fraudulent financial activities often amass proceeds
from their fraudulent activities that they must attempt to hide or legitimize.  To
accomplish these goals, they may utilize domestic and foreign banks and their attendant
services, cashiers checks, wire remitters, money drafts, real estate, and business or
employment fronts.

        b.  Individuals involved in fraudulent financial activities often conceal in their
residences and vehicles caches of documents relating to the fraud, large amounts of
currency, financial instruments, precious metals, jewelry, and other items of value or
proceeds of fraudulent financial activities and evidence of financial transactions relating
to the obtaining, transferring, secreting or spending of large sums of money derived from

fraudulent financial activities. These items are often stored in locked security containers
to protect their investment.

      c. Individuals involved in fraudulent financial activities often place assets in
names other than their own to avoid detection of these assets by government agencies;
however, they continue to use these access and exercise dominion and control over them.

      d. Individuals involved in fraudulent financial activities, and other activities
attempting to launder proceeds from illegal activities, often conspire with other
individuals, especially those who own or operate businesses, to structure financial
transactions and/or falsify records associated with certain transactions, in an attempt to
conceal or disguise the nature, location, source, ownership or control of the proceeds
and/or to promote the carrying on of the illegal activity. However, to escape detection
they mix those records with records of lawful transactions, and that, in such instances, it
is necessary to analyze the entire record to isolate the records of unlawful transactions,
and it is not feasible to extract the records of unlawful activities without such analysis.

      e. Individuals who engage in fraudulent financial activities utilize personal
residences to store letters, packages, computers and documents of material used in the
course of their fraudulent schemes. They also utilize personal residences and vehicles to
conduct their illegal activities and to store assets obtained in their illegal activities and/or
things that may be evidence of their activities. It is not uncommon that, the letters,
packages, computers, and documents stored at these locations contain or constitute
contraband, evidence, instrumentalities, or fruits of crime, specifically, a) legitimate and
counterfeit United States currency; legitimate and counterfeit foreign currency; legitimate
and counterfeit bank checks; legitimate and counterfeit traveler's cheques; legitimate and
counterfeit stored value cards; legitimate and counterfeit credit cards; b) legitimate and
counterfeit identification documents such as driver's licenses, birth certificates, and social
security cards and numbers; c) books, records, receipts, notes, ledgers, correspondence,
lists, and other materials related to the acquisition of cash; the making of wire transfers;
the acquisition of driver's licenses; the acquisition of stored value cards, credit cards and
access devices; and the acquisition of merchandise by use of funds with no legitimate
source; d) Books, records, receipts, bank statements and records, correspondence, money
drafts, letters of credit, money order and cashier check receipts, tax records, wire transfer
and/or money remitter's receipts and other documentation, passbooks, bank checks,
passwords, or other items evidencing the obtaining, secreting, transfer, and/or
concealment of assets and the obtaining, secreting, transfer, concealment, and/or
expenditure of money; e) Addresses and/or telephone numbers, listings, letters, cables,
telegrams, telephone bills, personal notes and other items reflecting names, addresses,
telephone numbers, communications, and illegal activities of associates of any persons
who may be involved in or victims of the crime; g) Counterfeit or legitimate document
transaction records, customer lists, financial statements,  real estate documents, and other
evidence of financial transactions relating to obtaining, transferring, secreting, or
spending various sums of money made from engaging in fraudulent financial
activities. h) Digital display pagers, cellular telephones, digital telephones, Blackberry
and similar wireless communication devices and other communication devices, which

may evidence communications or other data related to fraudulent financial activities; i) records, items and documents reflecting travel for the purpose of participating in fraudulent financial activities including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps, photos, and written directions to locations. j)computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described above in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants such as Personal Digital Assistants(PDA's), as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

     g.  Individuals who use computer related equipment will maintain financial records, co-conspirators names, victim names, and means of identification on personal computers. Evidence of these activities, remains on computer(s) or other forms of electronic storage media for long periods of time. Even when all evidence of such activity has been deleted, lost evidence can still be recovered from computers or other forms of electronic storage media. Also, a person involved in fraud may not remember to delete all incriminating evidence in every part of every computer file and may not even realize the incriminating nature of certain data. I believe that evidence of fraudulent financial activities will be found on computers found in Royce Newcomb's residence, vehicles, or storage units.

     h.  Individuals involved in a Investment Fraud related to real estate should be expected to maintain documents such as credit cards (including "pre-paid"), checks, credit card numbers, debit card numbers, bank account numbers and information, real estate contracts, or any other evidence pertaining to investment, the movement of funds, and/or the concealment of the scheme or its proceeds.

## VI. EVIDENCE TO BE SEARCHED/PERMISSION TO SEARCH COMPUTERS

36.    Based upon my training and experience, and upon the training and experience of other law enforcement personnel with whom I have consulted, I believe that Royce Newcomb and/or others used Computer Hardware at his residence listed in "Attachment A-1" in order to facilitate the fraudulent scheme described in this affidavit. Because Newcomb also controls the Subject Premises listed at Attachments A-2 and A-3 and has known about the investigation for some time, I expect that he may well have stored evidence (including electronic data) in those locations. I am also asking to search vehicles registered to Kathleen Newcomb and, apparently, used by Royce, as evidence would be in them if he used them to transport or secrete documents, computers, or other things described in Attachment B.
//

COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

37.     As described above and in Attachment B, this application seeks permission to
search and seize records that might be found on the Subject Premises, in whatever form
they are found.  One form in which the records might be found is stored on a computer's
hard drive or other storage media.  Some of these electronic records might take the form
of files, documents, and other data that is user-generated.  Some of these electronic
records, as explained below, might take a form that becomes meaningful only upon
forensic analysis.

38.     I have consulted with at least one agent responsible for computer forensic review.
After our discussions, I submit that if a computer or storage medium is found on the
premises, there is probable cause to believe those records will be stored in that computer
or storage medium, for at least the following reasons:

        a.      Computer files or remnants of such files can be recovered months or even
years after they have been downloaded onto a storage medium, deleted, or viewed via the
Internet.  Electronic files downloaded to a storage medium can be stored for years at little
or no cost.  Even when files have been deleted, they can be recovered months or years
later using forensic tools.  This is so because when a person "deletes" a file on a
computer, the data contained in the file does not actually disappear; rather, that data
remains on the storage medium until it is overwritten by new data.

        b.      Therefore, deleted files, or remnants of deleted files, may reside in free
space or slack space—that is, in space on the storage medium that is not currently being
used by an active file—for long periods of time before they are overwritten.  In addition,
a computer's operating system may also keep a record of deleted data in a "swap" or
"recovery" file.

        c.      Wholly apart from user-generated files, computer storage media—in
particular, computers' internal hard drives—contain electronic evidence of how a
computer has been used, what it has been used for, and who has used it.  This evidence
can take the form of operating system configurations, artifacts from operating system or
application operation, file system data structures, and virtual memory "swap" or paging
files.  Computer users typically do not erase or delete this evidence, because special
software is typically required for that task.  However, it is technically possible to delete
this information.

        d.      Similarly, files that have been viewed via the Internet are sometimes
automatically downloaded into a temporary Internet directory or "cache."  The browser
often maintains a fixed amount of hard drive space devoted to these files, and the files are
only overwritten as they are replaced with more recently viewed Internet pages or if a
user takes steps to delete them.

        e.      Based on my work in this investigation, I am aware that computer
equipment was used to carry out the offense.  People who gave money to Royce

Newcomb received emails from him. Those emails contained communications about supposed investments and also contained .pdf files purporting to depict properties in which people could invest through Newcomb. Thus, there is reason to believe that there is at least one computer system currently located on the Subject Premises and that the computer is both evidence, and a forfeitable instrumentality of, crime.

39.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

40.     Although some of the records called for by this warrant might be found in the form of user-generated documents (such as browser, email, and software application files), computer storage media can contain other forms of electronic evidence as well:

        a.      Forensic evidence of how computers were used, the purpose of their use, who used them, and when, is, as described further in Attachment B, called for by this warrant. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

        b.      Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

        c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

        d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on storage mediums that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance with particularity a description of the records to be sought, evidence of this type often is not

always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand the evidence described in Attachment B also falls within the scope of the warrant.

41.     Searching storage media for the evidence described in the attachments may require a range of data analysis techniques. It is possible that the storage media located on the premises will contain files and information that are not called for by the warrant. In rare cases, when circumstances permit, it is possible to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. For example, it is possible, though rare, for a storage medium to be organized in a way where the location of all things called for by the warrant is immediately apparent. In most cases, however, such techniques may not yield the evidence described in the warrant. For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed. As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

42.     Based upon my discussions with at least one agent responsible for computer forensic review, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

        a.      The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.

        b.      The volume of evidence. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal

evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

c.      Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d.      Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

43.     In light of these concerns, I hereby request the Court's permission to seize the computer hardware, storage media, and associated peripherals that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the hardware, media, or peripherals on-site for this evidence.

44.     I know that when an individual uses a computer to send emails in furtherance of an investment fraud, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. In this case, I have personally reviewed emails sent by Newcomb and provided to me by people who thought that they were investing money with him. I know that a computer is necessary to access email and handle .pdf documents. Thus, the computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer and other media are likely to be storage mediums for evidence of crime, that is, communications relevant to the investment fraud. From my discussions pertaining to computer forensic review, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

COMPLIANCE WITH UNITED STATES v. COMPREHENSIVE DRUG TESTING

45.     If it becomes necessary to seize or copy the computer hardware or storage media that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search for the evidence described in Attachment B, the analysis will

proceed as set forth in Attachment C, unless a court orders relief. If off-site review is necessary, it is difficult to predict how long such a review will take, especially when taking into consideration the necessarily dynamic nature of forensic examination and the possible extra time required by the procedures described in Attachment C.

46.     I also hereby request judicial authorization to retain copies of any additional seized storage media after the review is complete (to the extent that this warrant does not already authorize me to retain that storage media as seized forfeitable property). That judicial authorization is justified in this case in part because:

        a.      Should the execution of the warrant uncover data that may later need to be introduced into evidence during a trial or other proceeding, the authenticity and the integrity of the evidence and the government's forensic methodology may be contested issues. Retaining copies of seized storage media can be required to prove these facts.

        b.      Returning the original storage medium to its owner will not allow for the preservation of that evidence. Even routine use may forever change the data it contains, alter system access times, or eliminate data stored on it.

        c.      Because the investigation is not yet complete, it is not possible to predict all possible defendants against whom evidence found on the storage medium might be used. That evidence might be used against persons who have no possessory interest in the storage media, or against persons yet unknown. Those defendants might be entitled to a copy of the complete storage media in discovery. Retention of a complete image assures that it will be available to all parties, including those known now and those later identified.

        d.      The act of destroying or returning a storage medium could create an opportunity for a defendant to claim, falsely, that the destroyed or returned storage medium contained evidence favorable to him. Maintaining a copy of the storage medium would permit the government, through an additional warrant if necessary, to investigate such a claim.

//

//

//

//

//

//

//

19

e.      Similarly, should a defendant suggest an explanation for the presence of
evidence on a storage medium, it may be necessary to investigate such an explanation by,
among other things, re-examining the storage medium with that defense in mind.  This
may require an additional examination of the storage medium for evidence that is
described in Attachment B but was not properly identified and segregated previously.

CONCLUSION

47.     I submit that this affidavit supports probable cause for a warrant to search the
Subject Premises described in Attachments A-1, A-2, A-3, and A-4 and seize the items
described in Attachment B.

I declare under penalty of perjury that the above facts are true and correct to the
best of my knowledge, information, and belief.
DATED this 13th day of April 2010.

_____
JOHN M. PIOTROWSKI
Special Agent
United States Secret Service

Approved as to form,

_____
Matthew D. Segal, AUSA

GREGORY G. HOLLOWS
_____
GREGORY G. HOLLOWS
United States Magistrate Judge

ATTACHMENT A-1

The entire premises of 8720 Seville Circle, Granite Bay, CA 95746, including all rooms, attics, basements, crawl spaces, surrounding grounds, garages, storage spaces, outbuildings, yard, secure locations (such as safes, lock boxes or other locked or secured locations), vehicles, computer equipment and persons located on said property (collectively, the "Subject Premises").

This is a single family residence being occupied by Royce Newcomb and Kathleen Newcomb. The residence is a single family home located in Placer County, California. The 5,633 square foot home is a one-story, 5 bedroom / 4.5 bathroom home with a 4-car garage. The home is set upon a .89 acre lot.

## ATTACHMENT A-2

The entire premises of 355 E. Lassen Ave, Apt 53, Chico, CA 95973, including all rooms, attics, basements, crawl spaces, surrounding grounds, garages, storage spaces, outbuildings, yard, secure locations (such as safes, lock boxes or other locked or secured locations), vehicles, computer equipment and persons located on said property (collectively, the "Subject Premises").

This is one half of a single story duplex. The residence is located in Butte County and is approximately 900 square feet with 2 bedrooms and 1 bathroom.

ATTACHMENT A-3

The entire premises of 12650 Madrone Lane, Truckee, CA 96161, including all rooms, attics, basements, crawl spaces, surrounding grounds, garages, storage spaces, outbuildings, yard, secure locations (such as safes, lock boxes or other locked or secured locations), vehicles, computer equipment and persons located on said property (collectively, the "Subject Premises").

This is a single family residence rented by Royce and Kathleen Newcomb. The residence is a one story brown single family home with an attached 2 car garage located in Nevada County. The residence is approximately 1000 square feet.

ATTACHMENT A-4

| VIN | License Number | Vehicle |
|---|---|---|
| 4JGBF71EX7A162079 | 5WOA810 | 07  Mercedes GL 450 |
| 3VWEG71K97M188354 | 6BYX222 | 07  Volkswagen Jetta |
| WDBPJ78J31A014986 | 4SNT641 | 01  Mercedes CL600 |
| 5LMFU28555LJ05335 | 5MDF188 | 05 Lincoln Navigator |

### ORDER

The warrant in this case is very thorough, and the proposed "CDT procedures" (United States v. Comprehensive Drug Testing, 579 F.3d 989 (9th Cir. 2009) (en banc)) are all approved by the undersigned with one exception.

Although there is certainly probable cause to believe that evidence of Ponzi scheme fraud will be found on a computer or other electronic device(s) in the premises to be searched, we do not know at this time who may have been using the computer. We do not know whether persons, not involved in Ponzi activity, utilize electronic devices containing Ponzi type activity (unbeknownst to them) for completely legitimate reasons. Therefore, at this stage, the request that forensic personnel be given six months to conduct their investigation before return of property is even contemplated, even to completely innocent persons, is much too lengthy.

Therefore, within thirty days, or sooner if possible, following any seizure of electronic devices, the United States Attorney shall propose further procedures regarding return of non-contraband hardware and software, including original software, data, and/or functional mirror images of such. Events, such as arrests, may transpire during that period of time which make return of electronic material unlawful, impractical, not very important, or even unnecessary. Further, this order does not mean that all investigation by forensic personnel must be completed within thirty days. However, at this time, the court cannot justify retention of all seized electronic material for six months or longer.

April 20, 2010

GREGORY G. HOLLOWS

ATTACHMENT B

*related to Ponzi-type schemes*

The following things, in any form (written, electronic, or otherwise):

1.     Any records, that appear undated on their face or appear on their face to have been created after January 1, 2009, and are related to Royce Newcomb, Kathleen Newcomb, or RK Investment Properties, LLC's soliciting of, or agreeing with, any third party regarding an investment in real estate.

1A.     Any records, that appear undated on their face or appear on their face to have been created after January 1, 2009, and are related to Royce Newcomb, Kathleen Newcomb, or RK Investment Properties, LLC's delay in paying back money provided as a loan or investment.

2.     Personal telephone address books, telephone bills, photographs, and papers and documents consisting of names and/or lists of numbers.

3.     Articles of personal property evidencing domestic and foreign travel, specifically, records relating to domestic and foreign travel such as tickets, passports, visas, credit card receipts, travel schedules, receipts.

4.     Any documents related the maintenance of any safe, storage locker, or other thing that might be used to store documents or objects outside the Subject Premises.

5.     Any type of records that record any receipt of funds, any credit or debit receipts or payments occurring since January 1, 2009.

6.     Any and all credit, debit, pre-paid or stored value cards to include Mastercards, Visas, Discover Cards, American Express Cards, Gift Cards, Retail Store Cards and other financial institution issued access cards and any numbers that appear to be account numbers for such cards.

7.     For the period January 1, 2009 through the present, any correspondence, memoranda, or other communications relating to loans, financial matters, banking, or any transaction involving the expenditure or transfer of funds.

8.     For the period January 1, 2009 through the present, evidence of the purchase of assets, foreign or domestic, including, but not limited to, real estate, vehicles, appliances, electronics, luxury items, or securities.

9.     Money in any form including but not limited to cash, money orders, traveler's checks and cashier's checks, totaling $2,000.00 or more.

10.     Articles of personal property evidencing the obtaining, secreting, transfer, expenditure and/or concealment of money and assets specifically, books, receipts, records, vehicle records, bank statements and records, business records, money drafts,

letters of credit, United States and foreign currency, money orders and cashier check
receipts, wire transfer receipts, passbooks, bank checks, safes, and records and keys of
safe deposit boxes and storage lockers.

11.     Articles of personal property evidencing the identity of person occupying,
possessing, residing in, owning, frequenting or controlling the premises to be searched or
property therein, specifically keys, rental agreements and records, property acquisition
records, utility and telephone bills and receipts, photographs, answering machine tape
recordings, telephone beeper or paging devices, storage records, vehicle records, canceled
mail envelopes, correspondence, personal and travel identification documents, and
financial documents such as tax returns, bank records, safe deposit box records, canceled
checks, and other records of income and expenditure, credit card and bank records;

12.     Records and information comprising or containing online bank or brokerage
accounts.

13.     Records and information comprising or containing the names or other identifiers
of credit, debit or stored value card accounts in any form;

14.     Records and information comprising or containing information regarding any of
the following: California Check Cashing Stores, LLC, NetSpend, Inter National Bank,
Mastercard, Visa, Bank of America, Wells Fargo.

15.     Records and information related to Kevin Woody, John Angerer, Thomas White,
Ali Jai Faison, Baba Ali Corp, Grand Opportunities, RK Investment Properties, LLC (aka
RK Investments), David Roberts, George Sugarman, Barry Winnett, Contour Escrow
Services, Jesse Bradman, and Geoff Bagatelos.

16.     Any records or correspondence relating to the telephone number 916-289-1789.

17.     Records and information concerning credit, debit and or stored value card
transactions in any form to include but not limited to communications between financial
institutions and any persons or business, letters of credit, money orders, receipts, sales
drafts, deposit slips, financial statements for records for any business or persons.

18.     Any computers or computer devices to include:

        A.      File servers, desktop computers, laptop computers, mainframe computers,
and storage devices such as hard drives, Personal Digital Assistants (PDAs), cellular
telephones, Zip disks, thumb drives, Navigation Systems, DVD's, CD's, floppy disks,
MP3 players, computer routers, switches, telecommunications fiber cables, and computer
network equipment, that were or may have been used as a means to commit fraud.

        B.      Any electronic storage device capable of collecting, storing, maintaining,
retrieving, concealing, transmitting, and using electronic data, in the form of electronic
records, documents, and other materials recording on computer media or on media

capable of being read by a computer or computer-related equipment, such as fixed disks, external hard drives, removable hard disk cartridges, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, laser disks, or other memory storage devices, that were or may have been used as a means to commit fraud.

        C.      Computer content and connection log files, including dates, times, methods of connecting (e.g., Telnet, FTP, http), ports used, telephone dial-up caller identification records, and any other connection information or traffic data for computers that were or may have been used to commit fraud.

        D.      Computer-related documentation, meaning any written, recorded, printed, or electronically-stored material that explains or illustrates the configuration or use of any computer hardware, software, or related items that were or may have been used to place fraudulent orders and/or to commit fraud.

        E.      For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, "the Computer") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

                1.   evidence of who used, owned, or controlled the Computer at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

                a.   evidence of the attachment to the Computer of other storage devices or similar containers for electronic evidence;

                b.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Computer;

                c.   evidence of the times the Computer was used;

                d.   passwords, encryption keys, and other access devices that may be necessary to access the Computer;

                e.   documentation and manuals that may be necessary to access the Computer or to conduct a forensic examination of the COMPUTER;

                f.   contextual information necessary to understand the evidence described in this attachment.

      //

      //

2. Records and information evidencing the use of the Internet to communicate regarding investment, finance, and/or real estate, including:

   a.   routers, modems, and network equipment used to connect computers to the Internet;

   b.   records of Internet Protocol addresses used;

   c.   records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

ATTACHMENT C

If this Court will not issue the requested search warrant without the inclusion of protocols under United States v. Comprehensive Drug Testing, 579 F.3d 989 (9th Cir. Aug. 26, 2009) (en banc), the following procedures will be observed unless a court orders relief:

1.      If it becomes necessary to seize or copy the computer hardware or storage media that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search for the evidence described in Attachment B, I expect the analysis will proceed as follows:

        a.      Agents involved in the investigation (the "investigatory agents") will not examine or retain any data other than those things described in Attachment B.  A separate Comprehensive Drug Testing ("CDT") review team will search through seized storage media and segregate out the things described in Attachment B.  The CDT review team will transmit to the investigatory agents those things.  Other than the things described in Attachment B, the CDT review team will not communicate any information they learn during the segregation process absent further approval of the court.  Thus, the CDT review team will not transmit to the investigatory agents, things to which it has gained access only because the CDT review team was required to segregate seizable from non-seizable data when that information is not within Attachment B, except upon specific authorization by the court.  If the CDT review team encounters information outside the scope of Attachment B which potentially is subject to seizure as evidence of another crime, as fruit of another crime or as an instrumentality of another crime, a member of the CDT review team may seek appropriate authorization from this Court to take further action with respect to such evidence/fruits or instrumentalities.  An investigator with appropriate familiarity with how a computer works can, after examining forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.  The process of identifying the exact files, blocks, configuration settings, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion requires detective work and judgment in deciding, based on what one has just seen, the best step to take next.  For example, one file might provide a clue that a computer's owner was storing information in an unexpected location.  Only upon discovering that file would an investigator realize that the warrant calls for information stored in that unexpected location.  The necessarily dynamic nature of this inquiry makes it unlikely that an investigator can expect the CDT review team to accurately identify and transmit, on the first try, all things called for by the warrant.  Consequently, it is likely that investigatory agents will repeatedly consult with CDT review team about the results of his investigation and inquire whether, knowing that information, the CDT review team becomes aware of additional things called for by the warrant.

        b.      Contextual information necessary to understand the evidence described in Attachment B, and to establish its admissibility in subsequent legal proceedings, also falls

within Attachment B. Thus, this information will be sought by the CDT review team, and will be provided to the investigators.

        c.      Although it is not possible to accurately predict the exact composition of the CDT review team, it is possible that the team may include agents, computer specialists, analysts, and attorneys. The team will not necessarily consist only of persons with those job descriptions, and by mentioning those job descriptions I do not intend to represent anything about the manner in which they will conduct their review. It is also possible that the "team" of reviewers will consist of a single person.

2.      I plan to make the return required by Rule 41 of the Federal Rules of Criminal Procedure within 180 days after the date agents begin to search the premises. If more time is necessary, authorization from the Court will be sought. Any original seized storage media subject to forfeiture may be retained by the government. All other seized original media, if any, will be returned to the legal owner. After the review is complete, copies of all seized storage media will be retained under seal for use as a court might order.